UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRIANNA BENACQUISTA,

              Plaintiff,

        -v-                                 1:16-CV-581

JOSHUA SPRATT, CITY OF WATERVLIET,
BOARD OF EDUCATION ENLARGED
CITY SCHOOL DISTRICT OF THE CITY
OF WATERVLIET, NEW YORK, and
WATERVLIET CITY SCHOOL DISTRICT,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

E. STEWART JONES HACKER MURPHY, LLP    RYAN M. FINN, ESQ.
Attorneys for Plaintiff                   DAVID I. IVERSEN, ESQ.
28 Second Street
Troy, NY 12180

LAMARCHE, SAFRANKO LAW FIRM        ANDREW R. SAFRANKO, ESQ.
Attorneys for Defendant Joshua Spratt
1539 Crescent Road
P.O. Box 5437
Clifton Park, NY 12065

GOLDBERG, SEGALLA LAW FIRM          JONATHAN M. BERNSTEIN, ESQ.
Attorneys for Defendant City of Watervliet
8 Southwoods Boulevard, Suite 300
Albany, NY 12211

REHFUSS, LIGUORI LAW FIRM           STEPHEN J. REHFUSS, ESQ.
Attorneys for Defendants Board of Education
   and Watervliet City School District
40 British American Boulevard
Latham, NY 12110

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION  and  ORDER**

## I. INTRODUCTION

Plaintiff Brianna Benacquista ("Benacquista" or "plaintiff"), a former student at Watervliet High School, initially filed this civil rights action in Supreme Court, Albany County, against defendants Joshua Spratt ("Spratt"), Watervliet City School District (the "District"), the District's Board of Education (the "Board"), and the City of Watervliet (the "City").  Plaintiff alleges that Spratt, a City police officer employed part-time by the District as a "school resource officer," coerced her into an illegal sexual relationship during her senior year of high school.

Benacquista's six-count federal complaint, which she filed after defendants removed this action to federal court, asserts claims for federal relief pursuant to 42 U.S.C. § 1983 for violations of her Fourteenth Amendment rights to equal protection (Second Cause of Action) and due process (Fourth Cause of Action) as well as for violations of her rights secured under Title IX of the Education Amendments of 1972 ("Title IX") (Third Cause of Action).  Plaintiff's complaint also asserts state law claims pursuant to the Dignity for All Students Act ("DASA") (Sixth Cause of Action), negligence (First Cause of Action), intentional infliction of emotional distress (Fifth Cause of Action), and battery (Fifth Cause of Action).

The District and the Board (collectively the "School Defendants") have moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) seeking dismissal of the Second, Fifth, and Sixth Causes of Action.  The motion is fully briefed and has been considered on the basis of the submissions without oral argument.

## II. <u>BACKGROUND</u>[1]

During Benacquista's senior year of high school, the District employed Spratt, an officer with the City's police department, as a part-time "school resource officer."  Compl. ¶ 9. A school resource officer like Spratt "is a police officer who is assigned to act as a liaison between the police department and the staff and students at a school district."  <u>EC ex rel. RC v. Cty. of Suffolk</u>, 882 F. Supp. 2d 323, 336 (E.D.N.Y. 2012).  Spratt typically spent three days a week at the District, where he maintained an office in the high school.  Compl. ¶ 20.

According to the complaint, Spratt used his status as both a City police officer and a school resource officer to "groom" Benacquista and at least two other unnamed female students; that is, Spratt built a friendship with each of them in an effort to "lure[ ] and coerce[ ]" them into "illegal sexual relationships."  Compl. ¶¶ 4, 15.  With respect to plaintiff in particular, Spratt initiated a friendship by spending "at least two or three class periods" with her each day before later volunteering to tutor her in trigonometry.  <u>Id</u>. ¶¶ 20, 25.  Eventually, Spratt and plaintiff engaged in a series of illegal sexual acts between April 19 and May 24, 2015, near the end of her senior year.  <u>See id</u>. ¶ 7.

As relevant here, Benacquista maintains that the District and its officials were on notice of Spratt's increasingly impermissible behavior but failed to take preventive or corrective action.  <u>See generally</u> Compl.  For example, plaintiff and other high school students, a "disproportionate" number of whom were female, would often "hang out" in Spratt's office, which was situated adjacent to one occupied by Assistant Principal Lewinter,

---

[1]  The following facts are drawn from Benacquista's operative complaint and are assumed true for purposes of this motion.  <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.) ("When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.").

for long periods of time.  Id. ¶¶ 21, 23.  During these "hang out" sessions, Spratt obstructed

the view into the window on his office door so that passers-by in the hallway could not see

inside.  Id. ¶ 26.

Benacquista further asserts that parents and various District employees raised

"repeated concerns" about Spratt's behavior that included, but were not limited to, their

observations that he was "flirting" and "getting too close" to female students.  Compl. ¶ 22.

For instance, Mary Griffin, a hall monitor, was "consistent[ly] concerned" about Spratt's

"inappropriate relationships" with female students and "repeatedly" raised these concerns

with the District.  Id. ¶ 21.  Likewise, other employees, such as Mrs. Dragon, Mrs. Coffey,

Mrs. Aubri, and Mrs. Lavick, "raised repeated concerns" about "the inappropriate

relationships" they had "repeatedly and consistently observed" Spratt form with several

female students.[2]  Id. ¶ 22.  According to the complaint, at least one parent also contacted

the District with specific concerns about how plaintiff and Spratt seemed to spend an

"inordinate amount of time" together.  Id. ¶¶ 19-20.

The complaint also asserts that Patrick Cunniff, Spratt's friend and a teacher at the

high school, had similarly exchanged "inappropriate text messages of a sexual nature" with

female high school students.  Compl. ¶ 27.  Cunniff was eventually terminated when the

District became aware of this behavior.  Id.  Finally, the complaint asserts that a number of

Spratt's fellow police officers were aware of his misdeeds and took no action despite being

required by law to do so.  Id. ¶¶ 28-33.

---

[2]  The complaint does not provide any further detail regarding these individuals or in what capacities
they were employed by the District.  However, drawing all reasonable inferences in favor of Benacquista,
each are assumed to have been employed as high school teachers or staff.

## III.  LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required."  Id.  "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims."  Id.; see also Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

## IV.  DISCUSSION

The School Defendants argue that Benacquista's equal protection, DASA, intentional infliction of emotional distress, and battery claims must be dismissed against them.  Further, they assert that punitive damages are not available against either the District or the Board.

### A.  Equal Protection (Second Cause of Action)

First, the School Defendants argue that Benacquista's § 1983 equal protection claims must be dismissed against them because plaintiff has failed to identify any similarly situated individuals or groups who were treated more favorably.  Alternatively, defendants argue the allegations in plaintiff's complaint are insufficient to establish that either entity was "deliberately indifferent" to reports of Spratt's sexual misconduct.  Plaintiff, citing Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520 (S.D.N.Y. 2006), responds that her equal

protection claims are for "gender based intentional discrimination and harassment" and therefore do not require her to supply proof of any similarly situated individuals or groups.  Further, plaintiff asserts that she has sufficiently pleaded that Spratt's "motivations were based upon gender" because he targeted "only female students" for "illegal sexual relationships."

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The parties agree that this constitutional provision is "essentially a direction that all persons similarly situated be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  Beyond this basic principle, however, further analysis of the parties' dispute on this issue is complicated by their apparent reluctance to engage with the relevant issues and, in Benacquista's case, an insistence on repeated citations to only tenuously relevant case law.

As an initial matter, Benacquista is correct to assert that various courts, in this Circuit and others, have recognized a constitutional right under the equal protection clause "to an educational environment free of sexual harassment."  Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist., 163 F.3d 749, 759 (2d Cir. 1998) (considering peer-on-peer harassment claim), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) (holding that Title IX does not preclude a parallel § 1983 suit "based on the Equal Protection Clause" for "plaintiffs alleging unconstitutional gender discrimination in schools"); see also Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996) (observing that "sex-based discrimination, including sexual harassment, may be actionable under § 1983 as a violation of equal protection"); Cowan v. City of Mt. Vernon, 95 F. Supp. 3d 624, 643

(S.D.N.Y. 2015) (observing that "[s]exual harassment that rises to the level of gender discrimination is actionable under § 1983 as violative of the Fourteenth Amendment right to equal protection"); Romero v. City of New York, 839 F. Supp. 2d 588, 626 (E.D.N.Y. 2012) (analyzing § 1983 equal protection teacher-on-student sexual harassment claim based on "illegal sexual relationship"); Jennings v. Univ. of N. Carolina, 482 F.3d 686, 701 (4th Cir. 2007) (recognizing "Fourteenth Amendment equal protection right to be free from sexual harassment in an educational setting"); S.T. v. Yakima Sch. Dist. No. 7, 2013 WL 807197, at *4 (E.D. Wa. Mar. 5, 2013) ("Sexual harassment by a public official in an educational setting violates the Equal Protection Clause and is cognizable under section 1983.").

Benacquista further cites to Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520 (S.D.N.Y. 2006), in support of her assertion that she is not required to identify any similarly situated comparators to maintain her equal protection claim; the School Defendants, for their part, cite to a number of different cases holding that just the opposite is true. Accordingly, a basic discussion about the various ways a plaintiff may plead an equal-protection-based cause of action is in order. There are a number of common methods:

First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'" Floyd v. City of New York, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting Brown v. City of Oneida, 221 F.3d 329, 337 (2d Cir. 1999)). Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." Brown, 221 F.3d at 337 (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886)). Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Floyd, 959 F. Supp. 2d at 570 (citation omitted).

With respect to these first three theories, a plaintiff "generally need not plead or show the disparate treatment of similarly situated individuals." Pyke v. Cuomo, 258 F.3d 107, 108-09 (2d Cir. 2001); see also Doe, 462 F. Supp. 2d at 546 (observing that courts have dispensed with the "similarly situated group" requirement in cases where the "differential treatment of the target group could otherwise be clearly demonstrated").

But these are not the only ways to plead an equal protection violation.  For instance, pursuant to Le Clair v. Saunders, 627 F.2d 606 (2d Cir. 1980) a plaintiff may also assert a "selective enforcement" claim by showing they were treated differently "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Savino v. Town of Southeast, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013).

Alternatively, pursuant to Village of Willowbrook v. Olech, 528 U.S. 562 (2000), an equal protection plaintiff may assert a so-called "class of one" claim by alleging that "they were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment." Doe, 462 F. Supp. 2d at 558.

Of course, both the "selective enforcement" and "class of one" equal protection theories "require a showing of similarly situated individuals or groups who were treated differently." Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).

Notably, the Second Circuit has also recognized a gender-based claim for "sexual harassment" that exists in addition to the equal protection theories discussed above.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 744 (2d Cir. 2003) (reversing grant of summary judgment to teacher-defendant who made frequent comments "of a sexual nature"); see also

Wyler v. Conn. State Univ. Sys., 100 F. Supp. 3d 182, 196 (D. Conn. 2015) (analyzing "hostile educational environment" equal protection claim based on supervisors' alleged failure to "adequately address or remedy sexual harassment")

This line of precedent, which borrows from "traditional Title VII 'hostile environment' jurisprudence," requires a showing that:  (1) "the victim subjectively perceived the environment to be hostile or abusive" and (2) "that the environment was objectively hostile."  Hayut, 352 F.3d at 745.  In addition, "[t]here must also be evidence that the alleged discrimination was carried out because of sex."  Id.  As the Second Circuit observed in Hayut, a "hostility" determination in the educational context is necessarily "fact-specific" and "entails examining the totality of the circumstances."  Id.

Although she insists otherwise, it is far from clear exactly which of these various theories Benacquista seeks to pursue in this lawsuit.  If anything, plaintiff muddies the waters further by citing E.N. v. Susquehanna Tp. Sch. Dist., 2011 WL 3608544 (M.D. Pa. July 5, 2011), and Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp. 2d 695 (E.D. Pa. 2007), two out-of-circuit cases analyzing Title IX sexual harassment claims rather than § 1983-based equal protection ones.[3]

But "Title IX and § 1983 are different."  Hill v. Cundiff, 797 F.3d 948, 976 (11th Cir. 2015).  As the Supreme Court has cautioned, the standards for pleading and proving these two types of claims vary in certain, and sometimes important, respects.  See Fitzgerald, 555 U.S. at 257-58 (characterizing the standards for proving these claims against a school district

---

[3]   The Chancellor Court also analyzes a § 1983 due process claim based on a student's constitutional right to "be free from sexual assault by their teachers."  501 F. Supp. 2d at 710.  Although Benacquista has pleaded a due process violation as her Fourth Cause of Action, Compl. ¶¶ 74-83, the School Defendants have not moved to dismiss that claim.

as not "wholly congruent" because a "Title IX plaintiff can establish school district liability by

showing that a single school administrator with authority to take correction action responded

to harassment with deliberate indifference" while a similar § 1983 equal protection claim

requires a showing "that the harassment was the result of municipal custom, policy, or

practice").

However, in light of the relaxed standard applicable at the motion-to-dismiss stage, it

is sufficient for now to conclude that Benacquista has plausibly pleaded one or more of these

theories—either by identifying a similarly situated group (the male students at the high

school) who were not sexually harassed, see generally Compl., or by pursuing a "traditional"

equal protection claim that eliminates the need to identify any similarly situated comparators,

cf. White v. City of New York, –F. Supp. 3d–, 2016 WL 4750180, at *6 (S.D.N.Y. Sept. 12,

2016) (analyzing equal protection claim based on police refusal to take transgender man's

complaints) and Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir.

2009) (observing domestic violence victim could avoid similarly situated requirement provided

she could "show that it was her gender . . . that motivated the treatment she received"), or, at

the very least, plaintiff has pleaded the sort of gender-based sexual harassment claim in the

educational context recognized by the Second Circuit in Hayut.  See Romero, 839 F. Supp.

2d at 636 (denying summary judgment on Hayut-based equal protection claim where teacher

sexually assaulted and abused student "through an illegal sexual relationship" to which the

student "could not legally consent").

But this generous conclusion does not end the inquiry, since any of the equal

protection claims just discussed would first be asserted directly against Spratt, the only

individual defendant named in this action and one who has not moved for dismissal at this

stage.  Indeed, as both parties more or less acknowledge, Benacquista's attempts to assert equal protection claims against the District and the Board require different, additional analysis, since both municipal entities are shielded by the much-more-difficult-to-satisfy policy, practice, or custom requirement imposed by the Supreme Court in Monell v. Department of Social Services, 436 U.S. 658 (1978).[4]

Importantly, Monell does not provide a separate cause of action against a municipal entity; rather, "it extends liability to a municipal organization where that organization's [policy, practice, or custom] led to an independent constitutional violation." Segal v. City of New York, 495 F.3d 207, 219 (2d Cir. 2006); Nagle v. Marron, 663 F.3d 100, 116 (2d Cir. 2011) (recognizing that school districts are subject to a § 1983 suit under Monell).

However, "[b]efore a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" Carmichael v. City of New York, 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); see also Cash v. Cty. of Erie, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" and "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that

---

[4] Benacquista's opposition memorandum also includes a full page of law that appears to conflate the standards for municipal liability under Monell with those for supervisory liability under Colon.  "Supervisory liability is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." Burwell v. Peyton, 131 F. Supp. 3d 268, 302 (D. Vt. 2015) (citation and internal quotation marks omitted).  Plaintiff has not named any of the officials charged with supervising Spratt as defendants in this action.  Therefore, although references to possible supervisory or policymaking officials in the complaint, such as Assistant Principal Lewinter, bear on the initial sufficiency of her Monell claims, there are currently no separate claims asserted against any supervisory officials and these various alternative theories will be disregarded.

an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'" Cown, 95 F. Supp. 3d at 636 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)). Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'" Roe, 542 F.3d at 36 (citation omitted). However, a "municipal policy may be pronounced or tacit and reflected in either action or inaction." Cash, 654 F.3d at 334.

Accordingly, a plaintiff may satisfy this fifth element with evidence of: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Cown, 95 F. Supp. 3d at 637 (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

Benacquista's complaint does not include allegations to substantiate either the first or second Monell categories, since plaintiff has neither alleged the existence of a formal policy permitting Spratt's sexually exploitative behavior nor any affirmative acts by any specific policymaking officials in creating or enforcing the sort of constitutionally offensive policy that might permit or sanction such behavior.

Rather, Benacquista's allegations implicate the third and fourth Monell categories,

since she asserts that supervisory officials at the District were aware of and tolerated sexual assault, or, alternatively, that the School Defendants failed to undertake any meaningful attempt to supervise their staff in the face of repeated complaints about inappropriate behavior.

With respect to the third Monell category, a plaintiff may demonstrate that a policy maker "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." Miller v. Cty. of Nassau, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006). Among other things, however, a plaintiff seeking to assert this kind of Monell claim must ultimately "prove that the custom at issue is permanent and well-settled." Tieman, 2015 WL 1379652, at *16.

Insofar as Benacquista has attempted to plead this category of Monell claim, it must fail. Even at the motion-to-dismiss stage, a plaintiff cannot merely assert the existence of a municipal policy or custom in conclusory terms, but rather "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

Here, Benacquista merely alleges the School Defendants failed to respond to a series of repeated complaints by teachers and at least one parent over the course of a single year and that a fellow teacher, Cunniff, was terminated for engaging in substantially similar behavior during the same time period. These allegations are insufficient to plausibly allege that there was a "permanent and well-settled" custom of permitting sexual assault at the high school that was so "longstanding" as to be fairly considered an official policy.

With respect to the fourth category, "Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling

the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." Triano v. Town of Harrison, NY, 895 F. Supp. 2d 526, 534 (S.D.N.Y. 2012) (quoting Reynolds v. Guiliani, 506 F.3d 183, 192 (2d Cir. 2007)).  "However, such a failure to act, train, or supervise can constitute a municipal custom 'only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" Id. (quoting Reynolds, 506 F.3d at 192).

"A school district may be held liable for inadequate training, supervision[,] or hiring where the failure to train, hire[,] or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." Bliss, 2011 WL 1079944, at *8.  "To establish deliberate indifference[,] a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012).

"[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." Jones, 691 F.3d at 81.  For instance, "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 377 (S.D.N.Y. 2014) (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)).  Accordingly, "[s]uch a complaint must allege that 'the need for more or better supervision . . . was obvious,' but that the defendant 'made no meaningful attempt' to prevent the constitutional violation." Missel v.

Cty. of Monroe, 351 F. App'x 543, 546 (2d Cir. 2009) (summary order) (quoting Amnesty Am. v. Town of W. Hartford, 361 F.3d 113,127 (2d Cir. 2004) (Sotomayor, J.)).

At first blush, it seems implausible that Spratt's allegedly conscious, intentional decision to engage Benacquista in an illegal sexual relationship presented the sort of "difficult choice" that better training or supervision might prevent.  See R.A. v. City of New York, –F. Supp. 3d–,  2016 WL 4764950, at *3 (E.D.N.Y. Sept. 12, 2016); see also Noonan v. City of New York, 2015 WL 3948836, at *4 (S.D.N.Y. June 26, 2015) ("The decision to commit a sexual assault—a blatantly criminal act—cannot reasonably be seen as posing the type of 'difficult choice' contemplated by the Second Circuit . . . ."); Doe v. City of New York, 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013) (holding that plaintiff failed to plausibly allege defendant's decision to participate in a sexual assault was a "difficult choice of the sort that training or supervision will make less difficult"), aff'd, 558 F. App'x 75 (2d Cir. 2014).

However, although her complaint does not exactly provide overwhelming factual support for this claim, Benacquista has sufficiently pleaded a failure-to-act-or-supervise Monell claim to survive dismissal at this early stage.  Drawing all reasonable inferences in her favor, plaintiff alleges that the District's policymaking officials failed to take any meaningful corrective or preventive action despite being repeatedly warned by various teachers, administrators, and at least one parent over the course of the school year about Spratt's improper and increasingly sexualized misconduct.

Further, Benacquista alleges that Spratt obstructed the window of his office door even though his classroom was situated adjacent to Assistant Principal Lewinter's office, who would therefore have had ample opportunity to observe, or at least look into, Spratt's increasingly suspicious behavior in light of the repeated concerns raised by school staff and

others.  Cf. Cash, 654 F.3d at 335 (observing that, in appropriate cases, the "deliberate

indifference" inquiry must be undertaken in light of a municipal entity's affirmative duty to

protect those in its custody).

    And although the fact that Cunniff is alleged to have been terminated when his

misconduct was discovered might seem to indicate that Spratt actually "acted without

authorization and without the knowledge of any municipal decisionmaker," Missel, 351 F.

App'x at 546, it is equally plausible, at least at this stage, to infer that the District's discovery

of Cunniff's sexual misconduct would have warranted some manner of investigation into any

internal or external complaints about Spratt, one of Cunniff's known associates.  Cf. RF v. S.

Country Cent. Sch. Dist., 2016 WL 5349782, at *12 (E.D.N.Y. Sept. 23, 2016) (rejecting

Monell claim based on a failure to train or supervise where record established school had

acted promptly upon receiving information of teacher's improper sexual relationship with a

student).  Accordingly, the School Defendants' motion to dismiss Benacquista's equal

protection claim against them will be denied at this time.

## B. **Dignity for All Students Act** (Sixth Cause of Action)

    Next, the School Defendants argue that Benacquista's state law DASA claim must be

dismissed because the statute does not create a private right of action.  In support of this

argument, defendants point to Terrill v. Windham-Ashland-Jewett Central School District, 176

F. Supp. 3d 101 (N.D.N.Y. 2016) (Suddaby, C.J.), and Motta ex rel. Motta v. Eldred Central

School District, 36 N.Y.S.3d 239 (N.Y. App. Div. 3d Dep't 2016), two recent cases in which

state and federal courts have declined to permit private plaintiffs to pursue DASA-based civil

claims.  Plaintiff, for her part, acknowledges these unfavorable holdings as well as the fact

that DASA does not grant an explicit private right to sue, but nevertheless requests a finding

at this juncture that is contrary to the line of precedent running through <u>Terrill</u> and <u>Eldred</u> <u>Central School District</u>.

"DASA is intended to create and implement school board policies in order to afford all students in public schools an environment free of discrimination and harassment caused by incidents of bullying, taunting or intimidation through the appropriate training of personnel, mandatory instruction for students on civility and tolerance and reporting requirements." <u>Eldred Cent. Sch. Dist.</u>, 36 N.Y.S.3d at 241 (internal citations, citations, and internal quotation marks omitted).

As Benacquista has acknowledged, DASA does not grant an explicit private right of action.  However, "where a statute does not expressly establish a private right of action . . . a court may look to the overall structure of the legislation to determine if a private right of action should nevertheless be implied." <u>Martinez v. Capital One, N.A.</u>, 863 F. Supp. 2d 256, 263 (S.D.N.Y. 2012).

"Under New York law, the criteria for determining whether a statute implicitly creates a private right of action include:  (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." <u>Martinez</u>, 863 F. Supp. 2d at 263 (quoting <u>Sheehy v. Big Flats</u> <u>Cmty. Day, Inc.</u>, 73 N.Y.2d 629, 633 (N.Y. 1989)).

As noted above, a small-but-growing body of state and federal court decisions have evaluated the criteria for inferring an implied private right of action in the context of DASA and determined there is no such right to sue.  <u>Terrill</u>, 176 F. Supp. 3d 101 (reviewing legislative materials and observing that "DASA was intended to be a preventative, rather than

punitive, measure"); Eldred Cent. Sch. Dist., 36 N.Y.S.3d at 241 ("To imply a private right of action would not further the legislative purpose or comport with the statutory scheme."); see also C.T. v. Valley Stream Union Free Sch. Dist., –F. Supp. 3d–, 2016 WL 4368191, at *13 (E.D.N.Y. Aug. 16, 2016) (considering the reasoning of Terrill and Eldred Central School District to be persuasive and concurring in the determination that "there is no private right of action under DASA").

To be sure, none of these three decisions are binding precedent in this particular case. Nevertheless, Terrill's thorough analysis of this issue is sufficient to compel the conclusion that DASA sets forth aspirational goals for educational institutions, not remedial avenues for private plaintiffs. Importantly, and as Chief Judge Glenn Suddaby also observed in Terrill, nothing about this conclusion prevents an injured student-plaintiff like Benacquista from pursuing other enforcement mechanisms, such as her claims under Title IX, in an effort "to remedy the harm DASA seeks to prevent." 176 F. Supp. 3d 101. Accordingly, because DASA does not create a private right to sue, plaintiff's sixth cause of action must be dismissed in its entirety.

### C. Emotional Distress and Battery (Fifth Cause of Action)

The School Defendants also seek dismissal of Benacquista's fifth cause of action, which asserts claims for intentional infliction of emotional distress and battery "against all defendants." See Compl. ¶¶ 84-89. According to defendants, neither entity can be held vicariously liable for these intentional torts, which are based on Spratt's illegal sexual relationship with plaintiff. In opposition, plaintiff expressly disclaims any reliance on the principles of vicarious liability and instead insists that defendants, as Spratt's employer, can nevertheless be held directly liable in this case.

Because a review of the case law cited in the briefs reveals that the parties again appear to be talking past each other, a short discussion of the relevant legal principles is necessary.  "A school district, like any other employer, may be held vicariously liable under the doctrine of respondeat superior for a tort committed by an employee in the course of the performance of the employee's duties."  Mary KK. v. Jack LL., 611 N.Y.S.2d 347, 348 (N.Y. App. Div. 3d Dep't 1994); see also Bektic-Marrero v. Goldberg, 850 F. Supp. 2d 418, 434 (S.D.N.Y. 2012) ("The doctrine of respondeat superior renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.").

"The purpose of the rule is to render the employer responsible, in proper cases, for the employee's tortious acts, which although errant, were done in furtherance of the employer's business."  Rausman v. Baugh, 682 N.Y.S.2d 42, 43 (N.Y. App. Div. 2d Dep't 1998).  "The theory is that the employer should, as a required cost of doing business, in an appropriate case, compensate a party harmed by an employee who was acting not on his or her own behalf, but in the employer's service."  Id.

"To state a claim for respondeat superior, a plaintiff must plead facts showing, among other things, that the tortious conduct causing the injury was undertaken within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests."  Doe v. Alsaud, 12 F. Supp. 3d 675, 677 (S.D.N.Y. 2014).

In other words, "an employer may be held liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment."  Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (N.Y. 1999); see also Ramos v. Jake Realty Co., 801 N.Y.S.2d 566, 567 (N.Y. App. Div. 1st Dep't 2005) (recognizing the doctrine reaches even intentional torts, such as an employee's

alleged assault, provided the tortious conduct at issue occurred within the scope of employment).

As noted above, Benacquista has expressly disclaimed reliance on this common law doctrine, and for good reason: "[n]o decision in New York has been cited to date in which the doctrine of respondeat superior was held to apply to sexual assault." Doe, 12 F. Supp. 3d at 677. As other courts have noted, this de facto bar to vicarious liability in sexual assault cases exists because that sort of misconduct "is a clear departure from the scope of employment, having been committed for wholly personal motives. Kunz v. New Netherlands Routes, Inc., 882 N.Y.S.2d 565, 567 (N.Y. App. Div. 3d Dep't 2009) (quoting N.X. v. Cabrini Med. Ctr., 97 N.Y.2d 247, 251 (N.Y. 2002)).

But this limitation on vicarious liability does not leave an injured plaintiff without a state law remedy against an employer for its employee's alleged misconduct. "In cases where an injured plaintiff's cause of action fails because the employee is acting outside the scope of employment, a direct cause of action against the [employer] for its own conduct, be it negligent hiring, supervision, or other negligence, may still be maintained." Doe v. Guthrie Clinic, Ltd., 22 N.Y.3d 480, 485 (N.Y. 2014); see also Bliss v. Putnam Valley Cent. Sch. Dist., 2011 WL 1079944, at *9 (S.D.N.Y. Mar. 24, 2011) ("A school district has a duty to supervise teachers to the extent that teachers may potentially abuse students.").

Given these well-settled principles of law, the School Defendants assert that Benacquista's fifth cause of action, which by her own admission is an attempt to hold these defendants *directly* liable for Spratt's alleged sexual misconduct, is duplicative of her first cause of action, which already asserts a negligence claim "against all defendants" based on, inter alia, the School Defendants' alleged failure "to take appropriate actions" to prevent

Spratt's sexual misconduct.  Compl. ¶¶ 47-56.

Not so, says Benacquista.  In defense of this position, plaintiff cites to Jara v. Initial Contract Servs., 699 N.Y.S.2d 411 (N.Y. App. Div. 1st Dep't 1999), a short decision from the Appellate Division which notes in passing that an employer may be held liable for an employee's conduct where the employee was either (1) "acting within the scope of his employment when he engaged in the offensive conduct" or (2) where the employer "had knowledge of the offensive conduct and ignored it."  Id.

Of course, the former basis for imposing liability mentioned in Jara is the hopefully-now-familiar doctrine of respondeat superior, which gives rise to the sort of vicarious liability on which Benacquista has already expressly disclaimed any reliance.  It therefore appears that plaintiff's continued opposition to the School Defendants' argument on this point must be grounded in the latter avenue mentioned in Jara; that is, the Appellate Division's statement that an employer may directly liable in tort where it "had knowledge of the offensive conduct and ignored it."

As already discussed, that statement is a relatively uncontroversial legal principle that sounds quite a bit like the sort of negligence-based claim already pleaded by Benacquista in her first cause of action and one which the School Defendants concede is at least viable as a cause of action against them.  See, e.g., Dia CC. v. Ithaca City Sch. Dist., 758 N.Y.S.2d 197, (N.Y. App. Div. 3d Dep't 2003) ("[A] school has a duty to adequately supervise students in its care, and may be held liable for injuries that are foreseeable and proximately related to the school's failure to provide adequate supervision.").

Nevertheless, a closer examination of Benacquista's position in this argument leads the reader to Father Belle Cmty. Ctr. v. N.Y. State Div. of Human Rights on Complaint of

King, 642 N.Y.S.2d 739 (1996), the case cited by the Appellate Division in Jara for the theory of liability plaintiff continues insist she can maintain here.  Notably, Father Belle does in fact state that liability for sexual harassment will be imputed to an employer "and will result in the imposition of direct liability" in situations where "the employer acquiesced in the discriminatory conduct or subsequently condoned it."  Id. at 746 (observing that "the doctrine of respondeat superior, or vicarious liability based on the agency relationship, is not available in cases involving discrimination, including sex-based discrimination and its sexual harassment component").

But Benacquista would be well-advised to closely read the cases she has cited, since Father Belle is a case which examines a claim of "sex-based discrimination in employment," a statutory cause of action found in New York's Human Rights Law.  See N.Y. Exec. Law §§ 290, 296.  Under that body of law, "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it."  Med. Exp. Ambulance Corp. v. Kirkland, 913 N.Y.S.2d 296, 298 (2010).

Since Benacquista has not brought an employee-on-employee sexual harassment claim, this case law is of no help to her.  In fact, the remainder of plaintiff's citations in this section of her argument are unhelpful for similar reasons.  For example, Benacquista next cites to Higgins v. Metro-North Railroad Company, an appeal from an adverse summary judgment ruling in a Federal Employers' Liability Act ("FELA") claim.  318 F.3d 422, 424 (2d Cir. 2003).  In Higgins, the Second Circuit noted that a FELA plaintiff could hold an employer liable for an intentional tort committed by an employee by showing the employer itself was negligent.  Id. at 426.

In other words, Higgins simply recites the uncontroversial proposition than an injured plaintiff may pursue one or more theories of negligence directly against an employer for a tortious act committed by an employee outside the scope of employment.  318 F.3d at 426.  But just like Benacquista's citation to New York's workplace harassment law, it is completely unclear why plaintiff has resorted to a federal FELA case to state this argument.[5]

The upshot to all of this analysis is that insofar as Benacquista is asserting self-styled "direct" common law claims against the School Defendants based on an alleged failure to properly train or supervise Spratt or for failing to protect plaintiff from Spratt's sexual assault, those claims are already pleaded, and can still be pursued, in her negligence cause of action.  Accordingly, these claims will be dismissed as duplicative.

However, Benacquista is permitted to attempt to plead a claim for intentional infliction of emotional distress directly against the School Defendants based on their alleged acquiescence in, or failure to put a stop to, Spratt's behavior.  See, e.g., Fama v. Am. Int'l Grp., 760 N.Y.S.2d 534 (N.Y. App. Div. 2d Dep't 2003) (analyzing claim for emotional distress asserted directly against plaintiff's employer based on its alleged "acquiescence" to a fellow employee's improper behavior).

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection

_____

[5]  Benacquista also cites to Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 160 (2d Cir. 2014), to attempt to rebut the School Defendants' assertion that her intentional tort claims are duplicative of her negligence claim.  Again, however, Turley is almost completely inapposite to her case, since although it includes a discussion of emotional distress, the focus of the Second Circuit's discussion in that case is on the plaintiff's workplace harassment claims, which were based on federal and state employment law. Id. at 151, 161-62 (noting in context of emotional distress claim that "harassment, however egregious, ordinarily does not fall within the scope of employment").

between the conduct and the injury; and (4) severe emotional distress." Romero, 839 F. Supp. 2d at 628-29 (quoting Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)).

"Liability will be found 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Romero, 839 F. Supp. 2d 628-29 (quoting Howell v. N.Y. Post Co., 592 N.Y.S.2d 350, 353 (N.Y. 1993)).

The standard for asserting an intentional infliction of emotional distress claim is "rigorous, and difficult to satisfy." Howell, 592 N.Y.S.2d at 353 (citations omitted).  Indeed, an emotional distress claim is "highly disfavored" under New York law and "is to be invoked only as a last resort." Turley, 774 F.3d at 158 (citations omitted).

In fact, as the New York Court of Appeals recognized in Howell, it had rejected every claim for emotional distress it had considered up to that point "because the alleged conduct was not sufficiently outrageous." Howell, 592 N.Y.S.2d at 353.

Accordingly, "[t]hose few claims of intentional infliction of emotional distress that have been upheld [in New York] were supported by allegations detailing a longstanding campaign of deliberate, systematic, and malicious harassment of the plaintiff." Seltzer v. Bayer, 709 N.Y.S.2d 21, 23 (N.Y. App. Div. 1st Dep't 2000).

With this rigorous standard in mind, Benacquista's claim must fail.  Although it may yet prove to be viable directly against Spratt for his allegedly "deliberate, systematic" and "outrageous" sexual misconduct, plaintiff's allegations completely fail to indicate that the District or the Board's conduct—here, an alleged failure to investigate complaints about Spratt—was undertaken with intent to cause, or at least disregard of a substantial probability of causing, severe emotional distress.  See, e.g., Niles v. Nelson, 72 F. Supp. 2d 13, 23

(N.D.N.Y. 1999) (McAvoy, C.J.) (dismissing emotional distress claim predicated on, inter alia, defendant's failure to properly investigate student's claims of sexual harassment).

Further, and as the School Defendants point out, Benacquista's complaint fails to articulate specific facts regarding the "severe emotional distress" caused by the School District's failure to act or factual allegations describing how this emotional distress manifested itself.  Accordingly, plaintiff's emotional distress claim against the School Defendants will be dismissed.

### D. <u>Punitive Damages</u>

Finally, the parties dispute whether punitive damages are available against the District or the Board.  As the School Defendants correctly note, a large body of case law exists in support of the proposition that punitive damages are unavailable against school districts or boards of education.  <u>See, e.g.</u>, <u>Spencer v. Holley Cent. Sch. Dist.</u>, 734 F. Supp. 2d 316, 321 (W.D.N.Y. 2010) ("Punitive damages are not recoverable . . . against school districts in the absence of a public referendum affirming the alleged unconstitutional policy."); <u>Brown v. Baldin Union Free Sch. Dist.</u>, 603 F. Supp. 2d 509, 519 & n.9 (E.D.N.Y. 2009) (collecting cases holding that "school districts and boards of education are municipal entities immune from punitive damages").

Nevertheless, Benacquista maintains that Title IX's emphasis on "all available remedies" permits recovery for punitive damages against these entities.  Defendants respond by pointing to <u>Mercer v. Duke University</u>, a Fourth Circuit decision holding that "punitive damages are not available for private actions brought to enforce Title IX."  50 F. App'x 643, 644 (4th Cir. 2002) (per curiam) (observing that Title IX is "modeled after . . . and is interpreted and applied in the same manner as Title VI," a statute which does not permit

punitive damages).

Since Mercer was decided, numerous courts have cited it for the exact proposition the School Defendants advance here.  See, e.g., Minnis v. Bd. of Sup'rs of La. State Univ. & Agric. & Mech. Coll., 972 F. Supp. 2d 878, 889 (M.D. La. 2013); Hooper v. North Carolina, 379 F. Supp. 2d 804, 811 (M.D.N.C. 2005).  Equally important, an independent review of Title IX case law in this Circuit does not reveal any persuasive or controlling authority that might suggest an alternative conclusion.  Accordingly, punitive damages are not recoverable against the School Defendants.

## V.  **CONCLUSION**

First, because it is largely duplicative of her First Cause of Action asserting negligence-based relief, Benacquista's Fifth Cause of Action must be dismissed.  Second, to the extent her Fifth Cause of Action includes an attempt to plead an emotional distress claim directly against the School Defendants, that claim must also be dismissed as insufficiently pleaded.  Third, because DASA does not provide a private right to sue, plaintiff's Sixth Cause of Action must also be dismissed.  Fourth, punitive damages are not available against either the District or the Board.  Fifth, the Second Cause of Action will not be dismissed against the School Defendants.

Therefore, it is

ORDERED that

1.  The School Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2.  Plaintiff's Fifth Cause of Action is DISMISSED against the District;

3.  Plaintiff's Fifth Cause of Action is DISMISSED against the Board;

4. Plaintiff's Sixth Cause of Action is DISMISSED in its entirety;

5. Plaintiff's request for punitive damages against the District is DISMISSED;

6. Plaintiff's request for punitive damages against the Board is DISMISSED;

7. Plaintiff's Second Cause of Action REMAINS against the District; and

8. Plaintiff's Second Cause of Action REMAINS against the Board.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  November 17, 2016
        Utica, New York.